DAVID E. RUSSELL

*vs.*

FRANK B. CLARK, et al.

York.    Opinion August 12, 1914.

*Breach.    Contract.    Delivery.    New Contract.    Personal Property.*
*Sale.    Waiver.*

1.   The question whether a sale of personal property is completed or only execu-
tory, in cases between buyer and seller and where neither the statute of frauds,
nor the rights of third parties are involved, depends upon whether it was the
intention of the parties at the time the contract was made that the title to the
property should immediately pass to the buyer.

2.   And where anything remains to be done to identify the particular property
to be sold; or to ascertain the price to be paid for it by selecting it as to quality,
or weighing or measuring as to quantity; or where the seller is to do certain
things to the property to put it in that condition in which it may or ought to be
accepted by the buyer, the performance of those things are to be deemed pre-
sumptively a condition precedent to the passing of the title to the buyer.

3.   Where under the agreement between buyer and seller it is the duty of the
seller at his own expense, on receipt of orders from the buyer, to select, haul,
and load lumber on cars to be procured by him, before the buyer was bound to
receive the lumber or make payment for it, such agreement will not be con-
strued as an executed contract of bargain and sale, and the seller cannot recover
for the lumber unshipped in an action for goods sold and delivered.

4.   Where an agreement for the sale and purchase of lumber was made on Aug.
27, 1910 providing for its shipment within six months, the acceptance by the
seller of a subsequent agreement, on Feb. 10, 1911, which modified and extended
the original agreement must be held to be a waiver of the buyer's neglect to
give orders under which all of the lumber might have been shipped within
the six months.

5.   In the absence of any provisions in the agreements to the contrary it was the
defendant's right to have the different kinds of lumber shipped out as they
ordered it, provided they furnished orders under which it could all have been
shipped reasonably within the terms of the agreements.

On report.   Judgment for the plaintiff for $215.88, with interest
thereon from August 6, 1912.

This is an action of assumpsit to recover for oak lumber claimed to
have been sold and delivered to the defendants in August, 1912,

amounting, with interest, to $1387.68. Defendants plead the general issue, with brief statement of tender.

The case is stated in the opinion.

*George A. Goodwin, and Cleaves, Waterhouse & Emery*, for plaintiff.
*E. P. Spinney*, for defendants.

SITTING: SAVAGE, C. J., SPEAR, KING, HALEY, HANSON, PHILBROOK, JJ.

KING, J.   This case is before the Law Court on report.   It is an action of assumpsit.   There are four counts in the declaration.   The first is on an account annexed, as follows:

Springvale, Me., Aug. 29th, 1912.

Messrs. Clark & Cleale,
            To David E. Russell,            Dr.

| | | | | |
|---|---|---|---|---:|
| To  29806  ft. 2 in.  oak plank & outs at | $20 per M | | | 596.12 |
| "      4452  " White  "      " | 30 " | | " | 133.56 |
|       12038    " 3 in. Red. | 25 " | | " | 300.00 |

Jun. 10, 1912 Car 35793 B. & M.

| | | | |
|---|---|---|---:|
| To     3507  ft.  White oak | $30 | | 93.48 |
| "    4890      Red | 25 | | 122.40 |

|  |  |
|---|---:|
| | $1249.51 |
| Interest from Feb. 27, 1911 to Aug. 27, 1912 on | |
|     $1249.51 | 112.17 |
| Taxes for 1911  & 1912           . | 26.00 |
| | $1387.68 |

There are some slight errors in computation in the above account, but they need not here be considered.

The second count alleges in substance, that the plaintiff was the owner of 150658 feet of oak plank and boards located at Newfield, Maine; that on the 27th day of August 1910 he "sold and delivered" the same to the defendants, at prices specified, and that they "accepted and took into their possession" the same and have paid him the purchase price for 94262 feet thereof, leaving a balance of 46396 feet unpaid for, amounting to $1249.51, which the plaintiff claims to recover with interest, and also $26 paid for taxes on said lumber.

The third count alleges in substance, that the plaintiff was the owner of 150658 feet of oak plank and boards, and that on the 27th day of August 1910 the defendants agreed "in consideration of the plaintiff keeping said oak plank and boards for the said defendants, and not disposing of them to any other party, to take, buy, and receive all of said oak plank and boards," at prices specified, f. o. b. cars at loading point, "the same to be all ordered and taken within six months from August 27, 1910, which said agreement was confirmed in writing at that date and later reaffirmed and extended and said defendants again agreed to so take and to pay for all of said oak plank and boards as aforesaid," that the plaintiff has fully performed said agreement on his part, but that the defendants have refused to accept and pay for a portion of said lumber (describing the portion unpaid for as specified in the account annexed), and the plaintiff claims to recover under this count the same amount, with interest and the taxes paid, as stated in the first and second counts.

The fourth is a general or omnibus count, with a specification that the plaintiff claims to recover thereunder for the same lumber specified in the account annexed.

The plaintiff's alleged cause of action arises out of two agreements between the parties, the first having been made on August 27, 1910, and the other on February 10, 1911. It will materially assist in the determination of the meaning and scope of those agreements and the rights and liabilities of the parties thereunder, to point out briefly the circumstances and situation of the parties at the time the agreements were made, and also what has since been done by them acting under said agreements.

Prior to August 27, 1910, the plaintiff had piled in his lumber yard at Newfield, Maine, about 150000 feet of sawed oak lumber of different dimensions and qualities, but consisting chiefly of two, three, and four inch plank. It was piled closely in large piles and for that reason it was not readily examinable. The defendants comprised a copartnership doing business in Boston as wholesale lumber dealers. On August 27, 1910 Mr. Cleale, representing the defendants, examined the lumber to some extent in company with the plaintiff. He overhauled three or four of the piles to show the plaintiff what would be accepted and what rejected under the proposition he then made to purchase some of it. Thereupon the parties entered into an agreement, whereby the defendants were to take certain of the lum-

ber, to be selected as shown, and at prices specified f. o. b. cars at loading point. Confirming the agreement the following memorandum was signed by the parties in duplicate.

"Waterboro, Me., Aug. 27, 1911.

One carload more or less Short Oak ⎱ F. O. B. cars          $30.00
    Red and White         ⎰

C-L Oak Side Bds. Clear                                    30.00
                                           Boston

All White Oak Plank ⎱ $30.00      F. O. B. Loading point.
Selected as shown   ⎰

All Red Oak Plank ⎱ $25.00        F. O. B. Loading point.
Selected as shown  ⎰

To be shipped within six months from date. About 125 M. feet more or less."

We think it clear that this agreement contemplated that the shipments were to be made at the option of the defendants, and such appears to have been the understanding of the parties. But it was the duty of the defendants to furnish orders so that the lumber embraced in the agreement could be all shipped within the time specified, unless that time was extended. The agreement covered all the oak plank, to be selected as shown, including the two inch stock as well as the 3 and 4 inch. But it appears that the 2 inch plank did not cull to advantage, a large percentage of it being rejected, and accordingly it was a cause of some controversy between the parties, and became the subject of further negotiations which resulted in the agreement of February 10, 1911.

At the time the first contract was made shipping orders were given for three carloads, one was to contain three and four inch white oak, another the short oak, and the other the side boards. The carload of the short oak, and that of the side boards were paid for without controversy, but it was otherwise with the other carload. As to that the defendants claimed that the plaintiff did not ship the 3 and 4 inch stock as ordered, but instead sent a full carload of the 2 inch plank, for which they then had no order or use. Accordingly payment for that carload was held back and much dispute resulted on that account.

No more lumber was shipped till January 2, 1911.   In the meantime the parties had much contention, but finally they came to an understanding whereby the defendants should send a check for the unpaid carload and the plaintiff would ship more of the lumber.   December 9, 1910 the check was sent, but it was not satisfactory in amount and more controversy followed culminating almost in a conclusion of each party to have nothing further to do with the other in the premises. But on December 22, 1910 the plaintiff wrote the defendants that he had decided "to try two cars more but if I run up against any more experiences of the past our deal will close forever."   Accordingly on January 2, 1911 he shipped the fourth carload.   This was received as satisfactory and on January 13, 1911 the defendants sent a check for the same with an order for another carload of 3 and 4 inch stock. The plaintiff replied asking if he might make one-half of the carload 2 inch stock, but this was not assented to.   Then followed correspondence as to the 2 inch plank with the suggestion from the defendants that they might get an order at $20 per thousand for all the 2 inch "taking it right through, culls and all."   On February 9, 1911 Mr. Cleale came to Newfield and the parties made an additional agreement which was confirmed in a letter of Feb. 10, 1911 from the defendants to the plaintiff as follows:

"Confirming talk with you yesterday, we will take all the balance of the 2 inch Oak which you have there, taking the good and the outs, at $20 per thousand, f. o. b. the cars loading point.   This takes the place of our previous arrangement and applies to the 2 inch only. The balance of the contract stands as agreed.   Ship Clark & Cleale, Heywood Mass.

Don't put many outs on first cars and mix them in pretty well."

It was understood between the parties at the time the agreement of Feb. 10, 1911 was made that an order for a carload of 2 inch selected stock was to be shipped at $25 per thousand, and this was done. After that several carloads of the 2 inch stock were shipped to Heywood, but the plaintiff frequently requested that he might have an order to ship some of the thicker stock, as it was in his way, but the defendants did not grant his request, insisting that he should keep on shipping the 2 inch stock to Heywood, and on March 13, 1911 they wrote the plaintiff:   "Regarding the balance of the Oak, kindly load

up and ship *immediately* the balance of the 2 inch Oak for Heywood, cleaning up everything in 2 inch that you have there with the exception perhaps of a half a car, which you could hold to fill out a car of thicker stock later on, . . . but at the present time I want you to load up and ship at once all the 2 inch, as I have an order now which I can apply your stock on, and which I will not have later on." After that letter shipments of the 2 inch stock to Heywood continued. On April 11, 1911 an order for a carload of 3 inch and 4 inch stock was given and it was shipped. This the defendants claimed was not properly selected, and another controversy arose, and no more lumber was shipped for more than a year. Once more, however, the parties got together, and on June 10, 1912 another carload of the 3 inch stock was ordered and shipped. August 6, 1912 a check for $195.10 was sent in payment for that last carload. The amount of the check was less than the bill rendered, the defendants claiming that the plaintiff had charged in excess of the prices agreed for that carload. The check was not accepted, but returned. That is the carload of lumber sued for in the writ, and it appears by the pleadings that the defendants have brought into court the amount of that check for $195.10. No more of the lumber was ordered or shipped. August 28, 1912 the plaintiff's attorney wrote the defendants saying: "There is only one question. Will you give us directions to ship this lumber to you as per the original contract as shown and confirmed by your letters to Mr. Russell." It does not appear that that letter was answered, and this action soon followed.

If there was a breach of the agreement of August 27, 1910 on the part of the defendants in not ordering the oak shipped within the six months, we think the plaintiff must be held to have waived it by accepting the agreement of Feb. 10, 1911 which modified and extended the original agreement. Under the new arrangement the defendants were to take the balance of the 2 inch oak without culling it, taking the good and the outs, at $20 per thousand f. o. b. the cars at loading point, and they were also to take all the other oak remaining unshipped under the terms of the original agreement, that is, to be selected as shown on August 27, 1910, and at the original prices.

There was some evidence in behalf of the plaintiff tending to show that Mr. Cleale said in the interview of February 9, 1911 that all of the lumber should be shipped "before mud time." No time however was stated in the memorandum of February 10, 1911, within which the

lumber was to be taken, and we think that whatever may have been said in this regard was understood to be an expression of expectation rather than the assertion of a definite time limit which the parties understood to be of the essence of the contract. Nevertheless, as the new arrangement contemplated that the two inch stock, as well as the thicker stock that was to be selected as shown, was to be shipped as ordered by the defendants, it was their duty to furnish the plaintiff with orders so that the lumber could be shipped within a reasonable time after February 10, 1911.

It is claimed in behalf of the plaintiff, that by virtue of the contracts of August 27, 1910 and of February 10, 1911, and the shipments of a part of the lumber thereunder and payment therefor, the defendants became the owners of all of it; and that upon their neglect and refusal to furnish the plaintiff with orders for its shipment they became liable for what remained unshipped at the contract prices as for goods sold and delivered. We do not think that claim is sustainable.

The question whether a sale of personal property is completed or only executory, in cases between buyer and seller and where neither the statute of frauds nor the rights of third parties are involved, depends upon whether it was the intention of the parties at the time the contract was made that the title to the property should immediately pass to the buyer; and when no such intention is expressed in the contract itself, then all the facts and circumstances under which the contract was made are to be examined to discover if such an intention is the meaning of the acts of the parties. Keeping in sight always the fact that it is the real intention of the parties that is to control, courts have adopted certain rules to aid them in discovering that intention. And it is too well settled to require the citation of authorities, that where anything remains to be done to identify the particular property to be sold; or to ascertain the price to be paid for it by selecting it as to quality, and weighing or measuring it as to quantity; or where the seller is to do certain things to the property to put it in that condition or situation in which it may or ought to be accepted by the buyer, the performance of those things are to be deemed presumptively a condition precedent to the passing of the title to the buyer.

Under the contract of August 27, 1910, it was the duty of the plaintiff, on receipt of shipping orders from the defendants, to select the lumber as to kind and quality "as shown," to haul it to the railroad

and load it upon cars to be procured by him. The agreement of February 10, 1911, changed the original contract only in respect to the two inch stock remaining, which thereafter was not to be selected, but as to that it was still the plaintiff's duty to separate it from the general mass, haul it to the railroad, procure cars and load and ship it as ordered. In view of the fact that the plaintiff was to do those things at his expense before the defendants were bound to receive the lumber or make payment for it, it seems clear that it was not the intention of the parties that the title to any of the lumber should vest in the defendants immediately and before those things were done. We are therefore of the opinion that neither of the agreements constituted an executed contract of bargain and sale of the lumber, but only an executory contract for the sale of it, and accordingly that the plaintiff cannot recover for the lumber unshipped under the first and second counts in his writ, as for goods sold and delivered.

Has the plaintiff shown that he is entitled to recover under his third count in the writ wherein he alleges a breach of the contracts on the part of the defendants in not taking, or ordering the lumber shipped, as they had agreed to do? In determining that question we are concerned only with the acts of the parties after February 10, 1911, for, as before suggested, if there was any unreasonable neglect on the part of the defendants to furnish shipping orders prior to that date, we think it was waived by the plaintiff's acceptance of the new arrangement.

Under the contract of February 10, 1911, as well as under the first contract, the defendants had the option as to the order of shipments in respect to the kinds and qualities of the lumber. They were wholesale lumber dealers. They did not contract for this lumber for their own use, but to fill orders to be procured by them from others, a fact well understood by the plaintiff, and it was their right to have the different kinds of lumber shipped out as they ordered it, provided they furnished orders under which it could all have been shipped reasonably within the terms of the contract. If it would have been more convenient for the plaintiff to have had shipping orders so that the different kinds of lumber could have been shipped out in some particular order he should have so provided in the contract, and in the absence of any such provision it was not for the plaintiff to dictate the order in which it was to be shipped.

In the memorandum of February 10, 1911 the following shipping order was given: "Ship Clark & Cleale, Heywood, Mass. Don't put many outs on first cars and mix them in pretty well." That order applied to the 2 inch stock only, and until it was withdrawn it was not only the plaintiff's right but his duty to make shipments thereunder as fast as they could reasonably be made. It is clear from the correspondence that the defendants then had an order for that 2 inch stock, and from February 10, 1911 they were urging the plaintiff to ship it as fast as possible. On March 6th, 1911 they wrote him, in answer to his request for an order for the thicker stock, "I do not want any of this thick oak in here just at the present time, but, I do want you to clean up the 2 inch for Gardner. Ship along all the 2 inch you have there before you start out to ship anything else, or talk about shipping anything else." To that the plaintiff made the significant reply: "In regard to loading all the 2 inch oak before I ship the thick 3 in. would be wrong as I want the 2 inch to help out the culls." The defendants replied by letter of March 13, 1911, from which we have above quoted, urging the plaintiff to "ship *immediately* the balance of the 2 in. oak for Heywood,   .   .   I have an order now which I can apply your stock on, and which I will not have later on."

It appears from the evidence that only 4 or 5 carloads of the 2 in. stock were shipped after February 10, 1911, the last carload being shipped March 31, 1911, and on that day the plaintiff wrote the defendants to "give an order for the thick oak at once as I have nothing to do with the teams." Mr. Cleale testified that up to that time the plaintiff never had any orders to stop shipping the two inch stock to Heywood, and we do not find from the evidence that that was not the fact, yet according to the plaintiff's writ there remained unshipped "29806 ft. 2 in. oak plank & outs." The defendants contend that the plaintiff had ample opportunity to ship all the two inch plank and outs to Heywood and that it was his fault and not theirs that it was not all shipped, and that on account of his neglect to so ship they were obliged to have their order at Heywood filled from elsewhere. On the other hand the plaintiff testified that after February 10, 1911, he shipped to the defendants some box boards at their request (those not being included in these contracts, and that he shipped out as much of the 2 inch stock as he could with the teams he had, and that finally the defendants notified him not to ship any

more.  But after a careful study and consideration of all the evidence the court is constrained to the conclusion that the non-shipment of the balance of the two inch plank and outs is not reasonably attributable to the defendants' neglect to order it shipped, but rather to the plaintiff's own fault in not shipping it more promptly to Heywood under the defendants' order.

As already noted, on March 31, 1911, when the last carload of the 2 in. stock was sent, the plaintiff asked for an order for the thick oak, and he repeated that request on the 3rd of April, in response to which, on April 11th, the defendants sent an order for "a full carload of the 3 in. and 4 in. selected oak." The plaintiff admits that he did not ship that till May 18th, more than a month after the order was given. Answering the plaintiff's notice to them that this car had been shipped, the defendants wrote him that on account of his delay in filling the order they had been obliged to fill orders elsewhere, saying: "I don't understand why you were so long in shipping this, and I can't tell now when I can send you more orders for this." And on May 23rd they wrote him that they had examined the carload and were extremely dissatisfied with it, saying: "You have put considerable stock into this car which is not worth twenty-five ($25.00) dollars, and which I had no intention of taking at that price, when I bought it. We do not care for any more of the lumber, so you had better try and dispose of it elsewhere. We mean what we say in regard to this. We absolutely do not want any more of this, as it is running too poor, the way you are sorting it."

Mention has already been made of the fact that no more lumber was ordered or shipped for more than a year, and that then the parties tried to do business with each other once more and the last carload was shipped, for which the check that was returned was sent.

Taking into account the amount of the different kinds of lumber that was shipped after February 10, 1911, together with the amount of the different kinds that the plaintiff claims remains unshipped, it appears that very much the greater part of the unshipped lumber on February 10, 1911, was the two inch stock, which we think both parties understood was the more difficult stock to dispose of. And we do not think it should be held that the defendants broke their contract in not giving orders for the shipment of any of the thicker stock while they were urging the plaintiff to ship the two inch stock on the order they had for it at Heywood. The plaintiff sent out his

last carload of the two inch stock on March 31, 1911, and then requested an order for the thicker stock which the defendants gave him on the 11th of April 1911.    Up to that time we do not think it could be fairly held that the defendants had broken their contract as to the thicker stock.   The order of April 11th was not filled till May 18th, and after the carload arrived and was inspected by the defendants they notified the plaintiff that the order had not been filled according to the contract, and that they would give him no more orders for any of the lumber, claiming a breach of the contract on his part. And that is the vital question on this branch of the case, whether the plaintiff had reasonably kept and performed his part of the agreement, and given no justification for the defendants' refusal to furnish shipping orders under the contract.    In passing on this question the situation of the parties and their previous contentions should be kept in mind.    The defendants claim that from the very beginning the plaintiff had not selected the lumber "as shown" in filling their orders, and that his delaying and mis-filling their order of April 11, was not merely an isolated instance of neglect by him to live up to his contract, but another instance in a quite regular course of conduct on his part in disregard of the contract.    On the other hand, the plaintiff with equal insistence contends that the defendants were from the beginning carrying out a purpose to get the best quality of his lumber and then on some pretense refuse to take the poorer grades, and that their complaints as to the kind and quality of the lumber shipped on their orders were spurious and without any foundation in fact.

The question may not be free from doubt, but the burden was on the plaintiff to establish by a preponderence of the evidence that he had kept and performed his part of the agreement, and that the defendants had on their part repudiated it without justification. Upon a consideration of all the evidence the court is led to the conclusion that the plaintiff has not sustained that burden, and that he is not entitled to recover damages for a breach of the contract by the defendants.

It may be added also that if it could have been found that there was a breach of the contract on the part of the defendants in not accepting the lumber, there is not sufficient and definite evidence presented from which the damages could be reasonably ascertained and computed.    There was no evidence introduced in behalf of the plain-

tiff as to the amount of the different kinds and qualities of the lumber remaining unshipped, except the testimony of Mr. Carleton who surveyed it.   But he did not clearly show what part of the oak is white and what part red, and as to the dimensions of 19391 feet of it he made no division, answering that it was "Two and three inch oak." Nor is there any evidence of the market value of the remaining lumber at the time and place for its delivery under the contract.

It remains to consider if the plaintiff is entitled to recover for the carload of lumber sued for at the prices claimed by him.   This carload was received and kept by the defendants, but they claim that there was an agreement whereby the price for it was to be $25 per thousand.   On the other hand the plaintiff claims that there was no such an agreement, but that the carload was ordered and shipped as selected stock under the terms and prices of the original contract. From an examination of the correspondence between the parties just prior to the shipment of this carload we are of the opinion that the defendants' contention that there was a new contract as to the price of this carload is not sustained by the evidence.   Accordingly we find that the plaintiff is entitled to recover for that carload of lumber as claimed in his writ, and it avails the defendants nothing that they have brought into court the amount of the check tendered in payment for it since the check was less than the amount due therefor.

The conclusion of the court therefore is that the plaintiff is entitled to judgment for $215.88 with interest thereon from August 6, 1912.

*So ordered.*